# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
| --- | --- |
| RIMA E. LAIBOW, spouse of ALBERT N. STUBBLEBINE, III, deceased,<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>RICHARD MENASHE, WILLIAM OSER, LISA CASALE, THE COMMUNITY HOSPITAL GROUP d/b/a JFK MEDICAL CENTER, KINDRED HOSPITAL, ABC COMPANIES (1–10), DEFENDANT PARTNERSHIPS (1–10), JOHN DOE PHYSICIANS (1–10), JANE DOE NURSES (1–10), JANE MOE TECHNICIANS, and PARAMEDICAL EMPLOYEES (1–20),<br><br>    **Defendants.** | Civ. No. 19-4549 (KM) (SCM)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

*Pro se* Plaintiff Rima Laibow brings this case on behalf of the estate of her husband, Major General Albert N. Stubblebine, III. Ms. Laibow's complaint alleges negligence and statutory violations by several institutions and professionals involved in the medical treatment of Gen. Stubblebine in the weeks preceding his death in 2017. Before the Court are two motions: Defendant Kindred Hospital's Motion to Dismiss Plaintiff's Complaint with Prejudice and Compel Alternative Dispute Resolution in Lieu of an Answer (DE 10); and Defendant Lisa Casale's Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (DE 11). For the following reasons, both motions to dismiss are **GRANTED**.

## I. BACKGROUND[1]

### A. The Parties

Ms. Laibow and Gen. Stubblebine were married for twenty-three years before he died on February 6, 2017. (DE 1 ¶¶ 1 & 3). Ms. Laibow is the executor and administrator of his estate and a citizen of Arizona. (DE 1 ¶¶ 1 & 2). At the time of his death, Gen. Stubblebine was without known children, and he had a life expectancy (actuarially speaking, presumably) of 4.6 years. (DE 1 ¶ 3). He was a citizen of Arizona. (DE 1 ¶ 3). The amount in controversy in this dispute exceeds $75,000.00, exclusive of interest and costs. (DE 1 ¶ 4).

Defendant Richard Menashe is an osteopathic doctor with thirty-four years of experience. (DE 1 ¶ 5). He specializes in family medicine. (DE 1 ¶ 5). Dr. Menashe is affiliated with Defendant JFK Medical Center. (DE 1 ¶ 5).

Defendant William Oser is a medical doctor with thirty-four years of experience. (DE 1 ¶ 7). He practices internal medicine. (DE 1 ¶ 7). Dr. Oser is affiliated with Defendant JFK Medical Center.[2] (DE 1 ¶ 7).

Defendant Lisa Casale is a medical doctor who specializes in pulmonology. (DE 1 ¶ 9).

Defendant Community Hospital Group, Inc. ("Community") is a New Jersey non-profit corporation that owns, operates, and does business as JFK Medical Center ("JFK"). (DE 1 ¶ 11; DE 1 ¶ 12)[3]

---

[1]    For purposes of this motion, the facts alleged in the complaint, not yet tested by any fact finder, are assumed to be true. *See* Section II.A.1., *infra*. Docket entries will be cited as "DE __."

[2]    Ms. Laibow alleges that "Dr. Menashe is affiliated with JFK Medical Center" in paragraph 5 and repeats that allegation verbatim in paragraph 7. (DE 1 ¶¶ 5 & 7). The subject of paragraph 7, however, is Dr. Oser, and so this may be an editing error. Also unclear is whether plaintiff intended to allege that both doctors have thirty-four years of experience.

[3]    Ms. Laibow named JFK Medical Center separately in her complaint to ensure that the appropriate entity would be joined to and receive notice of this action. (DE 1 ¶ 12).

Defendant Kindred Hospital is a thirty-four-bed "transitional hospital" in Rahway, New Jersey. (DE 1 ¶ 13). Kindred advertises that as a "transitional care hospital" it offers "the same in[-]depth care [a patient] would receive in a traditional hospital but for an extended recovery period." (DE 1 ¶ 13). It partners with physicians to offer twenty-four-hour clinical care, seven days a week. (DE 1 ¶ 13).

### B. Gen. Stubblebine's Final Weeks

From September 1, 2016, to January 4, 2017, Gen. Stubblebine was a patient at JFK. (DE 1 ¶ 16). On January 4, 2017, he was transferred from JFK to Kindred at the behest of JFK personnel. (DE 1 ¶ 17). At the time, Ms. Laibow was Gen. Stubblebine's attorney-in-fact and health-care representative, but she was not given sufficient notice and did not consent to the transfer. (DE 1 ¶ 17).

Between January 4, 2017 and February 5, 2017, Gen. Stubblebine was a patient at Kindred. (DE 1 ¶ 18). On February 5, 2017, he was moved to Robert Wood Johnson University Hospital, where he died the next day, February 6, 2017. (DE 1 ¶ 18).

During this time, Defendants provided negligent services and deviated from the standard of care with respect to Gen. Stubblebine, which led to his death. (DE 1 ¶ 19–22).

### C. Ms. Laibow's Allegations

Ms. Laibow's complaint alleges eight counts of tort- and statute-based wrongdoing. She alleges the following:

#### 1. Counts 1 and 2: Negligence and Wrongful Death (Against Kindred and JFK)

Defendants had a nondelegable duty to exercise reasonable care towards Gen. Stubblebine. (DE 1 ¶¶ 26 & 35). Defendants failed to allocate sufficient resources to adequately care for Gen. Stubblebine and otherwise failed to exercise reasonable care, including by abandoning Gen. Stubblebine at JFK while he needed a ventilator to breathe. (DE 1 ¶¶ 27 & 36). Defendants violated the New Jersey Patient Bill of Rights, N.J.S.A 30:4-24.2, by:

- failing to properly evaluate, assess, and document Gen. Stubblebine's nutritional status and needs;
- failing to develop, document, and communicate a coherent, consistent, and medically appropriate treatment plan for Gen. Stubblebine;
- failing to regularly adopt, update, and implement a medically appropriate treatment plan for Gen. Stubblebine;
- failing to adopt, incorporate, and implement a medically appropriate nutritional plan in Gen. Stubblebine's treatment plan;
- failing to update and make necessary changes to the nutritional plan in the treatment plan as Gen. Stubblebine's medical condition evolved;
- allowing non-medical staff to interfere with and block the provision of critically needed parenteral feeding to Gen. Stubblebine after the same was ordered by the attending physician, namely when the Director of Nutrition noted that "nutrition has no place in this patient's care";
- failing to adequately supervise Gen. Stubblebine's care and treatment by failing to take necessary action to reverse medically disastrous decisions outside the scope of practice of non-medical staff, which contradicted the order to provide parenteral nutrition to Gen. Stubblebine;
- repeatedly delaying—for non-medical reasons—for over three weeks the installation of a PEG tube ordered for Gen. Stubblebine as medically necessary for his nutrition;
- failing to develop, document, communicate, and implement a coherent, consistent, and medically appropriate treatment plan for Gen. Stubblebine to ensure his adequate hydration;
- failing to take necessary action to ensure that Gen. Stubblebine was sufficiently hydrated, which resulted in numerous instances of

dehydration-induced tachycardia, which in turn caused long-term damage to his heart and kidneys;

- prescribing beta blockers, a medically inappropriate medication, to address Gen. Stubblebine's dehydration-induced tachycardia and other cardiac arrythmias, which significantly worsened Gen. Stubblebine's physical condition and caused his death;

- violating the Patient Bill of Rights when a physician attempted to circumvent Ms. Laibow's refusal to allow the administration of beta blockers by surreptitiously attempting to force their administration medications while Ms. Laibow was not present;

- failing to develop, document, and communicate a coherent, consistent, and medically appropriate treatment plan to ensure that muscle deconditioning, muscle wasting, pressure sores or decubitus ulcers would not develop in a comatose and otherwise immobilized and incapacitated Gen. Stubblebine;

- failing to implement or execute a coherent, consistent, and medically appropriate treatment plan to ensure that muscle deconditioning, muscle wasting, pressure sores or decubitus ulcers would not develop in a comatose and otherwise immobilized and incapacitated Gen. Stubblebine;

- wrongfully hiding and actively concealing Gen. Stubblebine's rapidly deteriorating skin and muscle condition, which quickly developed massive decubitus ulcers and pressure sores;

- failing to implement a regular schedule for turning Gen. Stubblebine's body to prevent or slow the development of massive decubitus ulcers and pressure sores on Gen. Stubblebine's body;

- using an ill-fitting, inappropriately designed intubation harness, which caused Gen. Stubblebine to suffer a facial decubitus ulcer, causing his upper lip to become severely damaged;

- providing inadequate nursing care by restricting movement and lacking proper decompression boots and pressure stocking, which caused Gen. Stubblebine to develop deep vein thrombosis,
- inappropriately administering medications and drugs that were not indented for Gen. Stubblebine, including insulin, while his records and charts demonstrated Decedent's low blood sugar; and
- failing to identify, incorporate and implement into Gen. Stubblebine's treatment plan cardiac resuscitation procedures, the failure of which exacerbated and compounded the negative impact of his February 5, 2017 cardiac arrest and further caused or contributed to his death on February 6, 2017.

(DE 1 ¶¶ 28 & 37).

Gen. Stubblebine was admitted to JFK with aspirational pneumonia and sepsis, which improved, but the sepsis returned more virulently as a result of a nosocomial infection caused by poor sanitary conditions. (DE 1 ¶¶ 28 &37). These infections included MRSA, C. diff., and pseudomonas. (DE 1 ¶¶ 28 & 37). They required the administration of stronger medications, which in turn were more toxic and caused more kidney and other organ damage. (DE 1 ¶¶ 28 & 37). Defendants' documentation of Gen. Stubblebine's care and treatment was lax, inaccurate, and inadequate. (DE 1 ¶¶ 28 & 37).

### 2. Counts 3 and 4: Negligence *Per Se* Under the New Jersey Patient Bill of Rights (Against Kindred and JFK)

Defendants failed to ensure, preserve and otherwise provide for Gen. Stubblebine's rights under N.J. Stat. Ann. § 30:4-24.2 and New Jersey common law. (DE 1 ¶ 48–49 & 56–57). Gen. Stubblebine suffered severe injuries and damages, including dehydration, malnutrition, weight loss, improper treatments, pressure ulcers, infections, extreme pain and discomfort, increased expenses associated with further surgical pain and expensive surgical procedures, mental and emotional anguish, a significantly decreased quality of life, deprivation of dignity, general and specific neglect and lack of care, and substantial costs and expenses for medical care and treatment and

ultimately suffered a prolonged, agonizing, untimely, and likely preventable death. (DE 1 ¶ 48–49 & 56–57).

### 3. Counts 5 and 6: Negligent Supervision (Against JFK and Kindred)

Defendants knew or should have known that their patients, including Gen. Stubblebine, were elderly and greatly limited in their ability to move and to communicate their needs clearly and effectively and needed particular care and supervision. (DE 1 ¶ 59–61 & 63–65). Defendants failed to exercise adequate care in the supervision of the treatment of their elderly patients, including Gen. Stubblebine, particularly with respect to his inability to communicate his health needs clearly and effectively. (DE 1 ¶ 59–61 & 63–65). Gen. Stubblebine sustained severe personal injuries, endured great pain and suffering, incurred medical expenses for the care and treatment of those injuries, and ultimately suffered a prolonged, agonizing, untimely, and likely preventable death. (DE 1 ¶ 59–61 & 63–65).

### 4. Counts 7 and 8: Punitive Damages (Against JFK and Kindred)

Defendants caused Gen. Stubblebine to sustain and suffer severe personal injuries and damages of both a permanent and temporary nature. (DE 1 ¶ 68 & 71). Gen. Stubblebine was forced to endure great pain and suffering, incur medical expenses for the care and treatment of said injuries, and ultimately suffered a prolonged, agonizing, untimely and likely preventable death. (DE 1 ¶ 68 & 71).

### D. Procedural History

On February 1, 2019, Ms. Laibow sued Richard Menashe, William Oser, Lisa Casale, the Community Hospital Group d/b/a JFK Medical Center, Kindred Hospital, ABC Companies (1–10), Defendant Partnerships (1–10), John Doe Physicians (1–10), Jane Doe Nurses (1–10), Jane Moe Technicians, and Paramedical Employees (1–20). (DE 1). Drs. Menashe, Oser, and Casale each answered and crossclaimed against the other defendants. (DE 4, 5 & 8).

On May 17, 2019, Kindred moved to dismiss the complaint and to compel arbitration of the claims. (DE 10). Kindred's motion papers included a

copy of an arbitration agreement that Ms. Laibow had signed on January 6, 2017, the day Gen. Stubblebine was admitted to Kindred. (DE 10-4). Ms. Laibow filed papers in opposition to the motion (DE 13), and Kindred filed a reply (DE 17).

On May 24, 2019, Dr. Casale moved to dismiss pursuant to Rule 12(b)(6).[4] (DE 11-1). Ms. Laibow filed papers in opposition to the motion (DE 20), and Dr. Casale filed a reply (DE 25).

## II.  DISCUSSION

Because this matter involves a controversy between citizens of different states and the amount in controversy is alleged to exceed the sum of $75,000, this Court has jurisdiction pursuant to 28 U.S.C. § 1332. Federal procedural law and New Jersey substantive law will apply. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

### A.  Standard of Review

#### 1.  Motion to Dismiss for Failure to State a Claim upon Which Relief Can Be Granted

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trs. Thereof v. Tishman Const. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

---

[4]   Motions to dismiss by JFK, Dr. Oser, and Community (DE 14), and Dr. Menashe (DE18), are pending and will be decided separately.

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 169 (3d Cir. 2013). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

Where, as here, the plaintiff is proceeding *pro se*, the complaint is "to be liberally construed," and, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007). Nevertheless, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.,* 704 F.3d 239, 245 (3d Cir. 2013). "While a litigant's pro se status requires a court to construe the allegations in the complaint liberally, a litigant is not absolved from complying with *Twombly* and the federal pleading requirements merely because s/he proceeds pro se." *Thakar v. Tan*, 372 F. App'x 325, 328 (3d Cir. 2010) (citation omitted).

The Third Circuit has liberally permitted pleading amendments to ensure that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990). Indeed, where a complaint is dismissed on Rule 12(b)(6) grounds, "a District Court must permit a curative amendment, unless an amendment would be inequitable or futile." *Alston v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004) (emphasis added); *accord Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000)).

## 2. Motion to Compel Arbitration

This Circuit's case law has meandered somewhat in defining the proper standard of review of a motion to compel arbitration. The upshot, however, is fairly clear. Where the issue can be decided without evidence, it will be, based on an application of the familiar Rule 12(b)(6) standard to the face of the pleadings. Failing that, however, the Court will permit discovery and decide the issue on a summary judgment standard, pursuant to Rule 56. If there is a genuine issue of fact, summary judgment will be denied and the issues will be tried.

Because arbitration is a "matter of contract" between two parties, "a judicial mandate to arbitrate must be predicated upon the parties' consent." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 771 (3d Cir. 2013) (quoting *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir. 1980)). Pursuant to the Federal Arbitration Act ("FAA"), a court may enforce a contract to arbitrate, but only if the court is satisfied that the "making of the agreement" to arbitrate is not "in issue." *Id.*

In *Guidotti v. Legal Helpers Debt Resolution*, the Third Circuit stated the approach a court must take on a motion to compel arbitration. The judiciary must balance the competing goals of the FAA: the speedy and efficient resolution of disputes, and the enforcement of private agreements. *Id.* at 773. Reconciling sometimes murky precedent in light of those competing interests, the *Guidotti* court reasoned that where "the affirmative defense of arbitrability of claims is apparent on the face of a complaint (or . . . documents relied upon in the complaint), . . . the FAA would favor resolving a motion to compel arbitration under a motion to dismiss standard without the inherent delay of discovery." *Id.* at 773–74. Such an approach "appropriately fosters the FAA's interest in speedy dispute resolution. In those circumstances, '[t]he question to be answered . . . becomes whether the assertions of the complaint, given the required broad sweep, would permit adduction of proofs that would provide a

recognized legal basis' for rejecting the affirmative defense." *Id.* at 774 (quoting *Leone v. Aetna Cas. & Sur. Co.*, 599 F.2d 566, 567 (3d Cir. 1979).

"In many cases, however, a more deliberate pace is required, in light of both the FAA's insistence that private agreements be honored and the judicial responsibility to interpret the parties' agreement, if any, to arbitrate." *Id.*

> [The Rule 12(b)(6) standard will not be appropriate] when either the motion to compel arbitration does not have as its predicate a complaint with the requisite clarity to establish on its face that the parties agreed to arbitrate or the opposing party has come forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did. Under the first scenario, arbitrability not being apparent on the face of the complaint, the motion to compel arbitration must be denied pending further development of the factual record. The second scenario will come into play when the complaint and incorporated documents facially establish arbitrability but the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question in issue. At that point, the Rule 12(b)(6) standard is no longer appropriate, and the issue should be judged under the Rule 56 standard.

> Under either of those scenarios, a restricted inquiry into factual issues will be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate and the non-movant must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement. In such circumstances, Rule 56 furnishes the correct standard for ensuring that arbitration is awarded only if there is an express, unequivocal agreement to that effect.

*Id.* (internal citations and quotations and external citation omitted).

## B. Kindred's Motion to Dismiss

Kindred moves this Court to compel arbitration of the claims against it, and therefore to dismiss the complaint. (DE 10-4 at 3). Kindred attaches to its papers a copy of an arbitration agreement between it and Ms. Laibow. (DE 10-5 at 3) Ms. Laibow has submitted a declaration in response, likewise attaching a copy of the arbitration agreement. (DE 13 at 27) She does not really dispute the

document's authenticity—rather, she claims that she does not remember it or did not knowingly sign it. I will therefore consider the arbitration agreement, which was submitted by both sides in support of their arguments for and against arbitration, and which appears to be well within the scope of what is properly considered under *Guidotti, supra.*

Kindred argues that the arbitration agreement between it and Ms. Laibow is enforceable in that there was no unfairness in contract formation and that the terms of the agreement are not substantively unconscionable. (DE 10-4 at 3–7). Ms. Laibow responds that the agreement is a "classic example of an adhesion contract." (DE 13 at 3). She disclaims any memory of signing it, and she alleges that she would not have done so if she had been knowingly confronted with it. (*Id.*). Ms. Laibow describes the agreement as "deficient and defective," because, according to her, the agreement does not explain what arbitration is and how it differs from litigation, and it was not written in plain language that an average consumer would understand. (*Id.*). Kindred responds that the terms of the agreement were clear and that Ms. Laibow voluntarily signed it on Gen. Stubblebine's behalf. (DE 17 at 2). Kindred adds that both the FAA and New Jersey law are clear that arbitration is a favored method of dispute resolution. (*Id.*).

Federal law is decidedly pro-arbitration. The FAA's purpose is "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). Thus, the statute makes agreements to arbitrate "valid, irrevocable, and enforceable," 9 U.S.C. § 2, subject only to traditional principles of contract formation and interpretation. The FAA provides that contract provisions manifesting the intent of the parties to settle disputes in arbitration shall be binding, allows for the stay of federal court proceedings in any matter that is referrable to

arbitration, and permits both federal and state courts to compel arbitration if one party has failed to comply with an agreement to arbitrate. 9 U.S.C. §§ 2 –4.

Cumulatively, those provisions "manifest a liberal federal policy favoring arbitration agreements." *Gilmer*, 500 U.S. at 24 (quotations omitted). Thus, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

The Supreme Court has recently given new content to that strong federal pro-arbitration policy. In fact, the Court seems to have implied, with disapproval, that the states were promulgating facially neutral rules that were in fact intended to discriminate against agreements to arbitrate vis-à-vis other contracts:

> The FAA . . . preempts any state rule discriminating on its face against arbitration—for example, a "law prohibit[ing] outright the arbitration of a particular type of claim." . . . . And not only that: The Act also displaces any rule that covertly accomplishes the same objective by disfavoring contracts that (oh so coincidentally) have the defining features of arbitration agreements.

*Kindred Nursing Centers Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426 (2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011)). Any consideration of State law, then, must bear in mind the *Kindred* preemption principle.

The fact remains, however, that arbitration is a creature of contract. Before referring any controversy to arbitration, the Court must determine whether the parties have indeed agreed to arbitrate it. *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003). That determination has three subparts: (1) whether the parties agreed to arbitrate; (2) whether the dispute is within the scope of the agreement; and (3) whether Congress nevertheless intended the dispute to be non-arbitrable. *Sarbak v. Citigroup Global Markets*, Inc., 354 F. Supp. 2d 531, 536–37 (D.N.J. 2004).

New Jersey courts, too, have held that arbitration "is a favored means of dispute resolution." *Hojnowski v. Vans Skate Park*, 187 N.J. 323, 342 (2006).

The state courts have "long noted our public policy that encourages the 'use of arbitration proceedings as an alternative forum." *Wein v. Morris*, 194 N.J. 364, 375–76 (2008) (citing *Perini Corp. v. Greate Bay Hotel & Casino. Inc.*, 129 N.J. 479, 489 (1992)); *see also Delta Funding Corp. v. Harris*, 189 N.J. 28, 39 (2006). Accordingly, arbitration clauses are afforded a "presumption of arbitrability," which can only be overcome if the Court can determine with "positive assurances" that the clause does not cover the dispute at issue. *AT&T Techs. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 650 (1986); *see also Moses H. Cone Mem'l Hosp.*, 460 U.S. at 4 ("Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). Ultimately, arbitration agreements should be read liberally to find arbitrability whenever possible. *Jansen v. Solomon Smith Barney, Inc.*, 342 N.J. Super. 254,257 (App. Div. 2001).

Here, Ms. Laibow argues that the arbitration agreement in this case is both procedurally and substantively unconscionable. Procedural unconscionability deals with the manner in which the parties entered into a contract, and it takes into consideration a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process. *Sitogun Holdings, Inc. v. Ropes*, 800 A.2d 915, 921 (N.J. Super. Ch. Div. 2002) (citations omitted). Substantive unconscionability, on the other hand, will be found when the terms of an agreement are so one-sided that they shock the court's conscience. *Id.* (citations omitted).

Under New Jersey law, unconscionability is fact-dependent. *See, e.g., Delta Funding Corp. v. Harris*, 912 A.2d 104, 110–11 (N.J. 2006). I have taken Ms. Laibow's factual allegations and submissions at face value. I nevertheless find that she has not set forth a valid claim of unconscionability.

The arbitration agreement plainly bears Ms. Laibow's signature. (She halfheartedly attempts to cast doubt on the validity of her signature but does not forthrightly deny signing. *See infra.*) The agreement provides that Kindred

"may reasonably rely upon the validity and authority of the representative's signature based upon actual, implied or apparent authority." (DE 13 at 30). Ms. Laibow's allegations do not support the assertion that she lacked the capacity to understand the agreement's terms or lacked the authority to sign on Gen. Stubblebine's behalf.

Ms. Laibow argues in essence that, at the time of signing, she was distraught and distracted by her husband's plight:

> [A]t the very moment her critically-ill husband was being admitted to Defendant Kindred Hospital by ambulance, when the Plaintiff had no opportunity to review such documents while her husband is being admitted by ambulance into Defendant Kindred Hospital, while her husband was on a ventilator for life support, before the Plaintiff could be with her husband.

(DE 13 at 3). She elaborates on this theme in a declaration attached to her brief, in which she argues that, whatever she may have signed, she did not *intend* to agree to arbitrate with Kindred:

> 4. On my arrival at Kindred Hospital, I was met by a social worker employed by Kindred who presented me with a handful of documents to sign so that my husband could be admitted immediately. I was told the papers were routine hospital admission documents which had to be signed immediately for my extremely[]ill husband to be admitted and receive treatment at Kindred Hospital.

> 5. Because of the quasi-emergency nature of my husband's admission into Kindred Hospital, I was given little or no time to review the handful of documents the social worker gave me to sign as the spouse of Gen. Stubblebine. I was presented with such documents either in an open area of Kindred or elsewhere, but in no event was I given the opportunity to sit and carefully read each of the many documents I was asked to sign at such time before I was allowed to see or be with my husband at Kindred Hospital.

> 6. I recall that some of the documents I signed were in large print, and others were in single-spaced, small print that was difficult for me to read. I was in such a state of worry and fear for my husband's well-being that my focus was on finding out how he was doing after the transfer in the ambulance.

15

7. Attached as Exhibit B hereto is a true copy of the "Voluntary Alternative Dispute Resolution Agreement" defendant Kindred Hospital has claimed I signed on June 6, 2017. I note that such document is in small, 9 pt print, is single-spaced, and is four pages in length. I do not remember ever seeing this document before, nor do I remember signing this document at any time, on either January 6, 2017 or January 9, 2017, nor has anyone ever given me a copy of such document for my records, to my knowledge.

7. I do not remember ever receiving or signing a copy of any form of "Voluntary Alternative Dispute Resolution Agreement" document. No one from Kindred Hospital ever told me that I was signing any form of "Voluntary Alternative Dispute Resolution Agreement." If they had, I would have refused to sign such an agreement. No one to my knowledge ever gave me a copy of such "Voluntary Alternative Dispute Resolution Agreement."

8. I would never have willingly signed away any of my husband's rights, nor have I ever agreed to sign away any of my rights under law.

9. I do not recognize the document the Defendant Kindred has produced as its "Voluntary Alternative Dispute Resolution Agreement," . . . .

(DE 13 at 23–25).

Ms. Laibow's complaint, even as supplemented by her declaration, does not sufficiently allege procedural unconscionability. She states that she lacked sufficient time to review the agreement in the haste and confusion of this medical emergency. The agreement itself, however, explicitly states that its execution is not a precondition to nursing care and that it may be cancelled within five business days. (DE 13 at 29). Ms. Laibow does not allege that she had a diminished mental capacity or was herself a patient at the hospital. Rather, she was the patient's legal representative and attorney-in-fact. (DE 10-5 at 2; DE 13 at 30) The patient's incapacity is the very rationale for granting such a power of attorney to the patient's representative. As such, it was her function to review and execute routine hospital admission documents that included the arbitration agreement. Ms. Laibow is not unsophisticated. Ms.

Laibow is herself a physician, and therefore presumably has at least some familiarity with hospital procedures and admission documents. The language of the agreement is clear, Ms. Laibow is an educated and sophisticated party, and her signature is evident on the page. A claim of mere inability to recall is not sufficient to establish procedural unconscionability. *See generally Moore v. Woman to Woman Obstetrics & Gynecology, L.L.C.*, No. A-0683-11T1, 2013 N.J. Super. Unpub. LEXIS 2035 (App. Div. Aug. 14, 2013) (compelling arbitration where plaintiff "recalled filling out paperwork but had no specific recollection of the arbitration agreement"); *see also Leodori v. CIGNA Corp.*, 175 N.J. 293, 302 (2003) ("[W]e determine a written agreement's validity by considering the intentions of the parties as reflected in the four corners of the written instrument.").

The Court certainly sympathizes with a patient or loved one who must cope with admission paperwork at a stressful time. But that, unfortunately, is a fact of life. Virtually anyone being admitted to a hospital for a serious condition could claim similar stress; it cannot be the law that any such a person, or their appointed representative, necessarily lacks the capacity to effectively execute such necessary documents.

I turn to the claim of substantive unconscionability. The agreement is also not substantively unconscionable; it does not take advantage of the stress and time pressure of hospital admission. Quite the contrary. The agreement's terms include the following:

> a) [The Patient] has the right to seek legal counsel concerning this Agreement;
>
> (b) the execution of this Agreement is not a precondition to the furnishing of services to the patient by the Hospital;
>
> (c) this Agreement may be cancelled by the Patient by delivering written notice of revocation to the Hospital not later than 5:00 p.m. local time on the fifth (5th) business day after signing the Agreement; and

(d) nothing in this Agreement shall prevent Patient or any other person from reporting alleged violations of law to the appropriate administrative, regulatory or law enforcement agency.

(DE 13 at 29).

The agreement provides that Kindred shall bear not only the costs of the mediator and the arbitrator, but also any other reasonable costs for the first five days of any hearing. If a hearing lasts longer than five days, the agreement calls for the parties to split the costs equally. The agreement requires a plaintiff to pay his or her own legal fees in arbitration (which he or she would also incur in traditional litigation). Finally, the agreement allows the parties to select a mediator and arbitrator. It suggests one such service, but ultimately permits the parties to select any independent and impartial decisionmaker. The agreement directs the parties to the procedural rules that it contemplates will govern any dispute resolution. (DE 13 at 27–31, *passim*)

Nor do Ms. Laibow's allegations support a conclusion that the agreement is otherwise unenforceable. The agreement plainly and succinctly summarizes the purpose of the document. A bold, capitalized, underlined heading on the first page of the agreement alerts the reader to an arbitration/mediation clause. Bolded text alerts the reader that arbitration is in lieu of, and waives, litigation in court.

## I.     ALTERNATIVE DISPUTE RESOLUTION ("ADR") AGREEMENT PROVISIONS

A.     Any and all claims or controversies arising out of or in any way relating to this Agreement or the Patient's stay at the Hospital including disputes regarding interpretation ·of this Agreement, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory. compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties (including, without limitation, any claim based on violation of rights, negligence, medical malpractice, any other departure from the accepted standards of health care or safety or the Code of Federal Regulations or unpaid hospital charges), irrespective of the basis for the duty or of the legal

theories upon which the claim is asserted. shall be submitted to alternative dispute resolution as described in this Agreement. Only disputes that would constitute a legally cognizable cause of action in a court of law may be submitted to alternative dispute resolution. **The parties to this Agreement understand that the dispute resolution process contains provisions for both mediation and binding arbitration. If the parties are unable to reach settlement informally, or through mediation, the dispute shall proceed to binding arbitration. Binding arbitration means that the parties are waiving their right to a trial, including their right to a jury trial, their right to trial by a judge and their right to appeal the decision of the arbitrator(s). Except as expressly set forth herein, the provisions of the New Jersey Arbitration Act, N.J.S.A 2A:23B-1, et seq., shall govern the arbitration. This Agreement includes claims against the Hospital, its employees and for its medical director(s) in his/her capacity as medical director.**

(DE 13 at 27).

The arbitration agreement was thus neither procedurally nor substantively unconscionable; it manifests the parties' agreement to arbitrate. Moreover, this dispute falls within the scope of the agreement—which covers "[a]ny and all claims or controversies arising out of . . . the Patient's stay at the Hospital." (DE 13 at 27). In light of New Jersey's strong preference for arbitration, *see Wein*, 194 N.J. at 375–76; *Hojnowski*, 187 N.J. at 342, the agreement is therefore valid. Kindred's to compel arbitration, and therefore to dismiss the complaint as against itself, is therefore **GRANTED**.

### C. Casale's Motion to Dismiss

Dr. Casale asks this Court to dismiss Ms. Laibow's complaint for failure to state a claim under Rule 12(b)(6).[5] (DE 11-1). Specifically, she asserts that

---

[5] Dr. Casale's theory relies on federal court procedures as embodied in rules and interpretive case law. Out of caution, I consider whether the matter would be considered under Rule 12(b)(1), rather than 12(b)(6), if the issue were treated as one of standing. *See St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000) ("The issue of standing is jurisdictional."). I conclude that no

19

Ms. Laibow, a *pro se* plaintiff, cannot sue on behalf of her late husband's estate. (DE 11-1). Ms. Laibow opposes this motion, claiming that Dr. Casale's motion is frivolous. A substantial portion of her opposition is devoted to her demand that the Court impose sanctions. (DE 20).

Title 28, United States Code, Section 1654 guarantees that "[i]n all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein." Although a non-lawyer is entitled to represent herself *pro se*, she may not appear *pro se* on behalf of another person or entity. *Schneller v. Crozer Chester Med. Ctr.*, 276 F. App'x 169, 170 n.1 (3d Cir. 2008). That rule has particular application to an appearance on behalf of an entity that is not a natural person. *See also Marrakush Soc'y v. N.J. State Police*, No. 09-2518, 2009 U.S. Dist. LEXIS 68057 at *92 (D.N.J. July 30, 2009) ("Any juridical entity (meaning, any fictitious/artificial/legal person) cannot appear in legal proceedings pro se.").

In *Estate of Twardy v. Lakes of Larchmont Condo Ass'n*, No. 15-6501, 2016 U.S. Dist. LEXIS 65322 at *1, 2016 WL 2901664 (D.N.J. May 18, 2016) (Hillman, J.), the estate's executor filed a *pro se* complaint on behalf of the estate. *Id.* The case came before the court on plaintiff's *in forma pauperis* motion, but the court expanded its inquiry to consider whether the executor was entitled to prosecute the action in the first place. *Id.* at *2 ("[I]t is highly questionable whether an executor of an estate who is not an attorney may file suit on behalf of an estate.").

*Estate of Twardy* collects some of the most pertinent case law. It cites, but does not explicitly adopt, the most liberal standard of *pro se*

---

further analysis is required because it would make no difference. Where, as here, the jurisdictional challenge is directed to the face of the complaint, the court's standard of review is indistinguishable from the familiar Rule 12(b)(6) standard.)). "A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to 'consider the allegations of the complaint as true.'" *Hartig Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016) (citation omitted).

representation, which is that an executor may represent the estate *pro se*, but only if she is the sole beneficiary *and* the estate has no creditors:

> The executor of the Estate, Francis Twardy, is not an attorney and is prosecuting the claims of the Estate. The United States Supreme Court in *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201–02 (1993) reinforced the rule that corporations and other artificial entities may appear in federal court only through counsel. Thus, it is highly questionable whether an executor of an estate who is not an attorney may file suit on behalf of an estate. *See, e.g., In re Olick*, 571 F. App'x 103, 106 (3d Cir. 2014) (citing *Rowland*, 506 U.S. at 201–02) (other citation omitted) (finding that a *pro se* trustee may not represent the trust in federal court because he is not an attorney and without counsel the trust may not appear in federal court); *c.f. Gray*, 352 F. App'x at 656 n.1 (citing *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997)) (noting that the appeal also raised a question as to whether Gray, as a non-lawyer, may represent the estate, but not reaching the question because the decision was based on the holding that the estate may not proceed *in forma pauperis*); *Caputo v. Forceno*, No. 15-1911, 2015 U.S. Dist. LEXIS 58536 at *2 (E.D. Pa. May 5, 2015) ("Federal courts generally will only permit a non-attorney to proceed *pro se* in her capacity as the administratrix of an estate when she is the sole beneficiary and the estate has no creditors.") (citing *Johnson v. Marberry*, 549 F. App'x 73, 75 (3d Cir. 2013) (per curiam) (pro se litigant could not prosecute claims on behalf of estate/heirs); *Malone v. Nielson*, 474 F.3d 934, 937 (7th Cir. 2007) (per curiam) ("[I]f the administrator is not the sole beneficiary of the estate, then he or she may not represent the estate in court."); *Jones ex rel. Jones v. Corr. Med. Servs., Inc.*, 401 F.3d 950, 952 (8th Cir. 2005) ("'[W]hen an estate has beneficiaries or creditors other than the administratrix or executrix, the action cannot be described as the litigant's own, because the personal interests of the estate, other survivors, and possible creditors will be affected by the outcome of the proceedings.'"))

*Id.* at *2–3.

Even under the most liberal view, then, a *pro se* plaintiff purporting to represent a decedent's estate must demonstrate that the estate has no other beneficiaries or creditors. The purpose of this rule is to ensure that the rights of the estate's beneficiaries or creditors are adequately protected. *See Murray v.*

*City of Phila.*, 901 F.3d 169, 171 (3d Cir. 2018) ("Attorneys' training, experience, and their 'ethical responsibilities and obligations' help ensure that a represented party's interests are not squandered . . . . Only attorneys may be sued for legal malpractice; a represented party could not seek recourse against a non-attorney for even the most egregious conduct." (citations omitted)).

Ms. Laibow's opposition fails to establish that she should be permitted to proceed as the *pro se* representative of Gen. Stubblebine's estate. The complaint is consistent with a conclusion that Ms. Laibow is the sole beneficiary of the estate—it states that at the time of his death, Gen. Stubblebine was without known children—but it does not precisely allege that. (DE 1 ¶ 3)[6] At any rate, the complaint fails to allege the other prerequisite— that the estate does not have any creditors.

Ms. Laibow's brief in opposition relies on authority that is not quite on point:

> [C]ontrary to Defendants' unwarranted misrepresentations, both New Jersey law (N.J.R 1:21-1(4) . . . and [] Third Circuit case law have plainly held that a *pro se* party, who is the real party in interest in an estate (as the Plaintiff is as the sole beneficiary of the Estate of the Decedent), may in fact appear and speak for that estate while acting *pro se. See, e.g., Murray v. City of Philadelphia*, No. 16-3145 [901 F.3d 169] (3rd Cir. 2018) . . . .

(DE 20 ¶ 4).

N.J.R. 1:21-1(4) is a state court rule. It provides that "[a] person not qualifying to practice pursuant to the first paragraph of this rule shall nonetheless be permitted to appear and prosecute or defend an action in any court of this State if the person . . . is a real party in interest to this action." I cannot apply state law standards as to who is a "real party in interest,"

---

6    To her opposition brief, Ms. Laibow attaches a copy of what purports to be Gen. Stubblefield's Last Will and Testament. (DE 20, Ex. A) Analysis of the status of the heirs and creditors nevertheless remains outside the scope of this, a Rule 12(b)(6) motion to dismiss the complaint.

however. A federal court sitting in diversity is bound to apply federal—not state—rules of court procedure. *See Erie*, 304 U.S. at 78.

The cited *Murray* decision does address federal standards. It does not directly support Ms. Laibow's position here, however, because it was deciding a different issue.

*Murray* cites at length the general rule that a non-lawyer may not represent another person or entity in federal court:

> Although an individual may represent herself or himself pro se, a non-attorney may not represent other parties in federal court. *See Collinsgru v. Palmyra Bd. of Educ.*, 161 F.3d 225, 232 (3d Cir. 1998) ("The rule that a non-lawyer may not represent another person in court is a venerable common law rule."), *abrogated on other grounds by Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007). This principle has been applied by the Supreme Court, this Court, and other courts in various contexts. *See, e.g., Rowland v. Cal. Men's Colony*, 506 U.S. 194, 202 (1993) (recognizing that corporations must be represented by counsel and that "save in a few aberrant cases, the lower courts have uniformly held that 28 U.S.C. § 1654 . . . does not allow corporations, partnerships or associations to appear in federal court otherwise through a licensed attorney" (footnote omitted)); *Simon v. Hartford Life, Inc.*, 546 F.3d 661, 667 (9th Cir. 2008) (holding that a non-lawyer could not litigate pro se on behalf of an ERISA plan); *Osei-Afriyie [v. Med. Coll. of Pa.]*, 937 F.2d [876,] 882 [(3d Cir. 1991)] ("We hold that Osei-Afriyie, a non-lawyer appearing pro se, was not entitled to play the role of attorney for his children in federal court."); *Phillips v. Tobin*, 548 F.2d 408, 411–12 (2d Cir. 1976) (holding that a non-attorney could not appear pro se to conduct a shareholder's derivative suit).

*Murray*, 901 F.3d at 170–71.

*Murray* then disallows representation by a plaintiff who, unlike Ms. Laibow, was a *non-beneficiary* administrator of the estate. Thus *Murray's* holding neither favors nor disfavors Ms. Laibow's position here. In so holding, however, *Murray* emphasized the policy considerations underlying the general rule requiring attorney representation:

We turn to whether a non-attorney, non-beneficiary administrator like Murray conducts her "own case" when representing an estate in federal court. 28 U.S.C. § 1654. The answer is no. If an estate has one or more beneficiaries besides the administrator, then the case is not the administrator's own because the interests of other parties are directly at stake. The interests of other parties, such as beneficiaries, may not be represented by a non-attorney administrator of an estate. Accordingly, we hold that this case is not Murray's own and that she may not conduct it pro se on behalf of her granddaughter, the estate's sole beneficiary.

Our holding accords with those of our sister Courts of Appeals to consider the question we decide today. Further, practical considerations support our holding. Attorneys' training, experience, and their "ethical responsibilities and obligations" help ensure that a represented party's interests are not squandered. *Collinsgru*, 161 F.3d at 231; *see Osei-Afriyie*, 937 F.2d at 882 (holding that a pro se father's "lack of legal experience has nearly cost his children the chance ever to have any of their claims heard."). Only attorneys may be sued for legal malpractice; a represented party could not seek recourse against a non-attorney for even the most egregious conduct. *See Collinsgru*, 161 F.3d at 231. Accordingly, our holding limiting pro se representation pursuant to § 1654 "serve[s] the interests of the represented party as well as the interests of adversaries and the court." *Pridgen*, 113 F.3d at 393.

*Murray*, 901 F.3d at 171–72.

All of that said, the *Murray* decision might be read to suggest in dictum that, if faced by the issue, it would adopt what I have termed the "liberal view" that the sole beneficiary of an estate with no creditors may represent it in federal court. *Murray* cited with approval several cases that, if only by negative implication, acknowledge or adopt that view:

See, e.g., *Rodgers* [*v. Lancaster Police & Fire Dep't*, 819 F.3d 205, 211 (5th Cir. 2016)]; (holding that a person may represent an estate pro se "if that person is the only beneficiary and the estate has no creditors"); *Malone v. Nielson*, 474 F.3d 934, 937 (7th Cir. 2007) (per curiam) ("[I]f the administrator is not the sole beneficiary of the estate, then he or she may not represent the estate in court."); *Jones* [*ex rel. Jones v. Corr. Med. Servs., Inc.*, 401

F.3d 950, 952 (8th Cir. 2005)] ("[The administrator] is not the only beneficiary/creditor of [the] . . . estate. Thus, as a nonattorney, [he] may not engage in the practice of law on behalf of others."); *Shepherd v. Wellman*, 313 F.3d 963, 970-71 (6th Cir. 2002); *Pridgen*, 113 F.3d at 393 ("[A]n administratrix ... of an estate may not proceed pro se when the estate has beneficiaries or creditors other than the litigant."); *see also Reshard v. Britt*, 839 F.2d 1499 (11th Cir. 1988) (en banc) (plurality opinion) (per curiam) (affirming by operation of law as a result of an equally divided en banc court the district court's ruling that estate representatives could not proceed pro se when the estate had other beneficiaries).

*Murray,* 901 F.3d at 172 n.3.

Ms. Laibow has not pled or otherwise established both that she is the sole beneficiary of the estate and that there are no other creditors. Dr. Casale's motion to dismiss is therefore **GRANTED**. The dismissal is, however, without prejudice, because it is not futile to anticipate that this defect could be cured— if not by amendment of the complaint, then surely by retention of an attorney to represent the estate.

### III.   CONCLUSION

For the reasons set forth above, the motions to dismiss are **GRANTED**. The dismissal as against Kindred is with prejudice, as the claim must be pursued in arbitration. The dismissal as against Dr. Casale is without prejudice to a curative amendment or retention of an attorney to represent the estate within 30 days.

An appropriate order follows.

Dated: November 21, 2019

**Hon. Kevin McNulty**
**United States District Judge**